# EXHIBIT "A"

**BURNHAM DOUGLASS**
Philip S. Burnham II, Esq. Attorney Id. No. 030951990
Michelle J. Douglass, Esq. Attorney Id. No. 025091988
450 Tilton Rd., Suite 200B
Northfield, NJ 08225
T: 609-788-3595 F: 856-751-5516
E: pburnham@burnhamdouglass.com
E: mdouglass@burnhamdouglass.com
Attorneys for Plaintiff, Stacie Lick

|  |  |
|---|---|
| **STACIE LICK,**<br><br>Plaintiff,<br><br>**v.**<br><br>**GLOUCESTER COUNTY PROSECUTOR'S OFFICE, GLOUCESTER COUNTY, THOMAS GILBERT (in his individual and official capacity), JAMES BALLENGER (in his individual and official capacity), WILLIAM PERNA (in his individual and official capacity), JANE/JOHN DOES 1-5 (in their individual and official capacities, if applicable),**<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br><br>GLOUCESTER COUNTY<br><br>Docket No.<br><br>Civil Action<br><br>**COMPLAINT & JURY DEMAND** |

Stacie Lick, residing in Gloucester County, New Jersey, says by way of Complaint against the Defendants as follows:

<u>**PRELIMINARY STATEMENT**</u>

This Complaint, brought by Stacie Lick, alleges claims under the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-1 et seq. ("LAD") for gender discrimination including: retaliation, a gender-based hostile working environment, disparate treatment, and aiding and abetting liability. It further alleges claims under the New Jersey Civil Rights Act, *N.J.S.A.* 10:6-2 et seq. ("CRA") for interference with and deprivation of New Jersey State Constitutional rights

including those found at Article I, ¶¶1, 2, 6, 18 and 19, and state substantive law including *N.J.S.A.* 40A:14-181 et seq. and the thereby promulgated and secured Internal Affairs Policies & Procedures for having objected to, spoken out against, expressed opposition to, and for having disclosed violations of law, statute, policy, and regulation.

## JURISDICTION

1. The conduct giving rise to the claims described in this Complaint occurred primarily in Gloucester County.

2. This Court has subject matter jurisdiction over Plaintiff's claims under N.J. Const., Art. VI §3, ¶2 et seq., *N.J.S.A.* 10:6-2, *N.J.S.A.* 10:5-13, and other applicable law.

3. This Court has personal jurisdiction over Defendants pursuant to N.J. Ct. R. 4:4-4 and other applicable law.

4. Venue is appropriate in this Court pursuant to N.J. Ct. R. 4:3-2, and other applicable law. However, Plaintiff reserves the right to move before this Court to transfer venue to another South Jersey vicinage if the interests of justice so require.

## THE PARTIES AND KEY WITNESSES

5. Plaintiff, Stacie Lick, ("Plaintiff" and/or "Lick") is a resident and citizen of the state of New Jersey.

6. At all times relevant to this Complaint, Plaintiff was employed by the Defendants, the Gloucester County Prosecutor's Office and/or Gloucester County, in New Jersey.

7. Defendant, Gloucester County (the "County" or "Defendant-County"), is a County government operating under the County Executive form of government. The County

provides for a seven-member Board of Chosen Freeholders and was originally incorporated in 1686.

8.  Defendant-County has offices at 2 South Broad Street, Woodbury, NJ 08096.

9.  Defendant-County employs the Gloucester County Prosecutor and all persons employed within the Gloucester County Prosecutor's Office such as the Chief of Detectives, detectives, and investigators, including the Plaintiff.

10. Defendant, the Gloucester County Prosecutor's Office ("GCPO" and/or "Defendant-GCPO") is a constitutionally created and established office and the Gloucester County Prosecutor's functions and duties are established by statute. *See N.J.S.A.* 2A:158-1.

11. Defendant-GCPO has offices at 70 Hunter St, Woodbury, NJ 08096.

12. The County and/or the GCPO are public bodies and employers subject to suit under the New Jersey Law Against Discrimination ("NJLAD"), and the New Jersey Civil Rights Act ("NJ CRA").

13. Defendant, James Ballenger ("Ballenger" and/or "Defendant-Ballenger") is a Lieutenant in the Investigations Section of the GCPO, is a supervisor of Plaintiff, and employee of the GCPO and/or the County.

14. At all times relevant to the Complaint, Defendant-Ballenger was acting as a policy maker of the Gloucester County Prosecutor's Office and/or Gloucester County and under color of state law and in this capacity was aided and abetted in his ability to discriminate and/or engage in unlawful activities.

15. Defendant-Ballenger is charged with acts which aided and/or abetted the other Defendants in unlawful activities.

16. Thomas Gilbert ("Gilbert" and/or "Defendant-Gilbert") is the Chief of County Detectives at the GCPO, and is an employee of the GCPO and/or the County, and is a supervisor of the Plaintiff.

17. At all times relevant to the Complaint, Defendant-Gilbert was acting as a policy maker of the Gloucester County Prosecutor's Office and/or Gloucester County and under color of state law and in this capacity was aided and abetted in his ability to discriminate and/or engage in unlawful activities.

18. Defendant-Gilbert is charged with acts which aided and/or abetted the other Defendants in unlawful activities.

19. William Perna ("Perna" and/or "Defendant-Perna") was, at times relevant to the Complaint, a Detective of the GCPO and an employee of the GCPO and/or the County.

20. At all times relevant to the Complaint, Defendant-Perna was acting as a policy maker of the Gloucester County Prosecutor's Office and/or Gloucester County and under color of state law and in this capacity was aided and abetted in his ability to discriminate and/or engage in unlawful activities.

21. Defendant-Perna is charged with acts which aided and/or abetted the other Defendants in unlawful activities.

22. All the preceding-mentioned current and former employees of the GCPO and/or the County were working within the course and scope of their employment, as agents, and/or on the basis of delegated authority of the GCPO and/or County during times relevant to the Complaint.

23. Defendants Jane/John Does 1-5, currently unidentified, are individuals and/or entities who, on their direct acts or on the basis of agency, delegated authority and/or respondeat superior, are answerable to Plaintiff for the acts set forth in this Complaint.

24. Charles A. Fiore ("Fiore") was, at times relevant to the Complaint, the Gloucester County Prosecutor, who was a public servant appointed to serve a term of years and his position is funded by taxpayer dollars.  He was, at times relevant, an employee of the GCPO and/or the County and a supervisor of Plaintiff.

25. On or about Thursday, March 5, 2020, Prosecutor Fiore announced his resignation and his replacement was named as the Gloucester County Prosecutor.

26. Lieutenant Langdon Sills ("Sills") began to oversee the Major Crimes Unit, within which Plaintiff did work, in or about 2015.  He was an employee of the GCPO and/or the County and a supervisor of Plaintiff.

27. Chief John Porter ("Porter") was an employee within the GCPO and/or the County.

28. Kris Gallagher ("Gallagher") is a Victim Advocate within the GCPO and/or the County.

29. Sgt. Steven Ingram ("Ingram") is a male employee within the GCPO and/or the County.

30.  Sgt. Robert Hemphill ("Hemphill") is a male employee within the GCPO and/or the County.

31. Detective Bryn Wilden ("Wilden") is a male employee within the GCPO and/or the County.

32. Detective Anthony Garbarino ("Garbarino") is a male employee within the GCPO and/or the County.

33. First Assistant Prosecutor ("FAP") Paul Colangelo ("Colangelo") is an employee within the GCPO and/or County.

34. Assistant Prosecutor ("AP") Dianna Rolando ("Rolando") is an employee within the GCPO and/or County.

35. Assistant Prosecutor ("AP") Alec Gutierrez ("Gutierrez") is a male employee within the GCPO and/or County.

## STATEMENT OF FACTS

36. Plaintiff began working as an investigator for the Gloucester County Prosecutor's Office ("GCPO") on or about October 6, 2003 and was initially assigned to the Major Crimes Unit ("MCU").

37. From approximately 2003-2010, Plaintiff had a reasonably good working relationship with Defendant-Ballenger.

38. In 2010, Defendant began to ignore and refuse any communication with both the Plaintiff and another Detective, Bryn Wilden.

39. Both the Plaintiff and Wilden confronted Defendant-Ballenger numerous times to address the situation and Defendant-Ballenger refused any communication or explanation for his behavior.

***Defendant-Ballenger Became Plaintiff's Supervisor and Began Creating an Environment of Hostility Towards Women***

40. In 2011, Defendant-Ballenger was promoted to Sergeant of the Major Crimes Unit and became Plaintiff's immediate supervisor.

41. Prior to his assignment, Lieutenant John Porter approached Plaintiff and advised her that he was aware of Defendant-Ballenger's behavior towards her and asked if Plaintiff had any issues working for him as her supervisor.

42. Plaintiff advised Porter that it would not be an issue if he would just communicate with her and she was advised that Defendant-Ballenger's behavior would be addressed.

43. In 2015, the members of the Major Crimes Unit did include the Plaintiff, Detectives Wilden, Malesich, Renner, Petroski and Garbarino who all reported Defendant-Ballenger's lack of supervision in the Major Crimes Unit to Chief John Porter during private meetings he held with the individual Detectives.

44. Det. Renner, another female Detective, specifically advised Chief Porter that she thought that the Plaintiff was her supervisor because Defendant-Ballenger did not acknowledge her work or provide her with direction; he directed her to the Plaintiff.

45. From approximately 2011-2016, Plaintiff worked under the supervision of Defendant-Ballenger.

46. During this time frame, Defendant-Ballenger treated Plaintiff differently than her male counterparts, and she began to feel mistreated because of her gender.

47. For example, Defendant-Ballenger would never ask about her investigations or follow up on any calls she received when on duty.

48. Defendant-Ballenger would celebrate the male detectives in the Major Crimes Unit, even when they completed minor tasks, but would very rarely acknowledge Plaintiff's accomplishments or inquire about her assignments.

49. Plaintiff has been the Child Abduction Team Coordinator (CART) since 2008 which fell under Defendant-Ballenger's command..  Plaintiff held training sessions twice a year, every year, for all of its CART members, to include all of the investigative personnel at the Gloucester County Prosecutor's Office; Defendant-Ballenger never attended any of the training sessions.

50. Defendant-Ballenger would make Plaintiff supervise the other detectives in the Major Crimes Unit working on sexual assault investigations and have her screen the calls on sexual assault cases from the Division of Child Protection and Permanency.

51. Defendant-Ballenger would ask Plaintiff to return his calls related to these cases, and intentionally overload her with a heavy caseload, and would give her more work than her male counterparts.

52. Defendant-Ballenger did mock the police academy that Plaintiff attended in front of her peers by stating that when he was a recruit in the State Police Academy in Seagirt, New Jersey they would laugh at the recruits in the Division of Criminal Justice Academy, which Plaintiff attended, and say that is not the kind of officer you want to be in law enforcement.

53. Although Plaintiff began to feel she was being treated differently by Defendant-Ballenger from 2011-2015, she never officially complained or reported his behavior during this timeframe.  However, this behavior was known and obvious to her peers.

54. Lieutenant Langdon Sills ("Sills") began to oversee the Major Crimes Unit in or about 2015, and Defendant-Ballenger maintained a supervisory position over Plaintiff.

55. On or about July 27, 2015, Plaintiff was called into a meeting in Sills's office and Defendant-Ballenger was in attendance.

56. Plaintiff had been working on an investigation from the weekend, and Defendant-Ballenger had requested a summary of the investigations that she had worked on in the previous year for the end-of-year report.

57. Plaintiff had not yet completed her summary, due to other emergent work obligations, and explained this to Defendant-Ballenger.

58. Defendant-Ballenger advised Plaintiff that she didn't complete her summary just to "break his balls."

***Plaintiff Reported the Gender Discrimination and Unequal Treatment of Defendant-Ballenger***

59. It was on this day, on or about July 27, 2015, that Plaintiff first told Defendant-Ballenger, in front of Sills, that he treated her worse than everyone else, that many were unhappy with his supervision, and that she was doing his job for him.

60. Defendant-Ballenger responded by accusing Plaintiff of talking about people behind their backs.  He could not defend his behavior.

61. Sills later called Plaintiff and said that she made valid points and that Defendant-Ballenger could not argue them.  However, Sills further advised that he was upset with Plaintiff because he took some of her accusations about the supervision personally.

***Plaintiff was Transferred and Promoted to Sergeant***

62. In March of 2016, Plaintiff was transferred to the Special Investigations Unit (IA) under the supervision of Sergeant Robert Hemphill.

63. Plaintiff was promoted to the Sergeant of the Unit in July of 2016 along with Defendant-Ballenger who was promoted to Lieutenant.  During this time, Ballenger was cordial to Plaintiff.  For the time-being, she was no longer under his supervision.

64. They celebrated their promotions together in the office and held a gathering at a restaurant.

65. From 2016-2018 there were no issues between the Plaintiff and Defendant-Ballenger and he would acknowledge her and communicate with her cordially.  Plaintiff believed it was because she was no longer under his supervision.

66. In or about November of 2017, Charles Fiore was sworn-in as the new Prosecutor of the Gloucester County Prosecutor's Office.

67. In February of 2018, Chief Thomas Gilbert ("Defendant-Gilbert") was assigned as the Deputy Chief of County Detectives and later promoted to Chief of County Detectives in May of 2018.

68. Due to personal relationships, Defendant-Ballenger became empowered by Defendant-Gilbert, and was essentially Defendant-Gilbert's second-in-command and acted as though he was in charge of all detectives.

### *Plaintiff Investigated and Found Defendant-Ballenger Culpable for Misconduct*

69. Defendant-Gilbert initially treated Plaintiff adequately, but his behavior began to change for the worse after Prosecutor Fiore and First Assistant Prosecutor Colangelo assigned Plaintiff an internal affairs investigation of Defendant-Ballenger.

70. This investigation was into Defendant-Ballenger's failure to supervise another detective who had failed to write over 100 reports during the time-frame that Defendant-Ballenger was his supervisor.

71. Defendant-Gilbert did not agree with the initiation of the investigation and had even announced at a supervisor's meeting that Defendant-Ballenger was not in trouble and had done nothing wrong (essentially saying the investigation was unfounded).

72. Due to Defendant-Gilbert's bias in favor of Defendant-Ballenger, Defendant-Gilbert was not allowed to be involved in the investigation and Plaintiff was required to report directly to Prosecutor Fiore and First Assistant Prosecutor Colangelo.

73. First Assistant Prosecutor Colangelo instructed Plaintiff to interview and investigate Defendant-Ballenger for failure to supervise in the internal affairs investigation.

74. On or about November 28, 2018, a written reprimand was issued to Defendant-Ballenger by Prosecutor Fiore and First Assistant Prosecutor Colangelo as a result of disciplinary charges which were sustained due to his failure to supervise a detective under his supervision.

75. Pursuant to this investigation and subsequent discipline of Defendant-Ballenger, Plaintiff reported violations of law, policy, regulation and/or rule in relation to Defendant-Ballenger's conduct.

***Plaintiff was Immediately Retaliated against By Defendant-Ballenger and Defendant-Gilbert for Exercising her New Jersey Constitutional and Statutorily Secured Rights***

76. Plaintiff's participation in the investigation, and her reports resulting from said investigation into Defendant-Ballenger's conduct led Defendant-Ballenger and Defendant-Gilbert to retaliate against her.

77. Defendant-Ballenger was disciplined as a result of Plaintiff's reports and submitted a rebuttal to his discipline blaming others and falsely accusing Plaintiff of influencing Prosecutor Fiore's decision to discipline him because of her personal dislike of him.

78. Defendant-Ballenger has mistreated Plaintiff since she reported his conduct that resulted in discipline.

79. Defendant-Ballenger ignores Plaintiff, forwards her voicemails messages, and does not follow up with her on email or conversations.

80. If Defendant-Ballenger needs to deliver Plaintiff something, he leaves it in the bin in her door to avoid any personal contact.

81. Defendant-Ballenger has become obsessed with Plaintiff's unit and makes negative comments about her unit, referring to them as the "haters."

82. Defendant-Ballenger advised other supervisors that he routinely checks the cases that the Plaintiff submits in the Infoshare database and accused her of "inflating" her statistics to get what she wants.

83. Defendant-Ballenger has retaliated against Plaintiff for her Constitutionally and statutorily protected reports of his violations of law, regulation, rule, and/or policy.

84. Due to the pronounced and dramatic change in behavior by Defendant-Ballenger and Defendant-Gilbert towards Plaintiff after she reported Defendant-Ballenger's public policy violations, in particular, his violation of laws, regulations, and rules regarding responsible supervision of officers for compliance with official documentation and preparation of incident reports, she began documenting various retaliatory and illegal actions by Defendant-Ballenger, Defendant-Gilbert, and others within the GCPO.

***Plaintiff Was Again Promoted, this time to Lieutenant, and Given the Position of Supervisor over the Special Victims Unit***

85. Despite the retaliation against her, Plaintiff performed exceptionally at the GCPO and was promoted to Lieutenant on or about January 29, 2019 and given the position of supervisor of the Special Victims Unit at the GCPO.

86. On or about February 8, 2019, a formal promotional ceremony was held for all of the promotions.

87. Defendant-Gilbert praised all of the promoted officers, except for Plaintiff.

88. Defendant-Gilbert walked right past Plaintiff multiple times and congratulated other promoted officers.  This was embarrassing to Plaintiff, whose family and friends were in attendance, and commented that Defendant-Gilbert was treating her poorly.

89. Plaintiff is the only female supervisor amongst the ranks of the Gloucester County Prosecutor's Investigative Division ("GCPID").

90. Plaintiff is the second female at the GCPO to make rank of lieutenant in approximately 25 years.

91. Plaintiff is the second female to ever have held the position of supervisor of the Internal Affairs Unit, i.e., Special Investigations Unit, within the GCPO.

92. In her capacity as supervisor, Plaintiff was responsible for conducting investigations that resulted in the recommendation of discipline of many male counterparts, as well as higher ranking male officers.

93. While the assignment to the Special Investigations Unit was an honor and privilege, the fact that Plaintiff has rendered findings adverse to some officers, most notably Defendant-Ballenger, led to Defendant-Ballenger initiating a smear campaign against Plaintiff.

94. Among other inappropriate and illegal acts, Defendant-Ballenger has retaliated against Plaintiff by creating a gender-based hostile work environment consisting of spreading false and disparaging statements about her, writing "anonymous" complaints about her,  refusing

to engage in professional communications, exhibiting a very hostile demeanor to her, mocking her, and engaging in differential treatment such as ignoring her in the presence of male counterparts, purposefully excluding her on written communications and meetings, and slandering her name within the GCPO and to outside agencies.

95. The hostile treatment has become unbearable and is further exacerbated by the fact that Chief of County Detectives, Defendant-Gilbert, openly supports the transgressions and misconduct of Defendant-Ballenger (and those favored by Ballenger).

96. Defendant-Gilbert contributed to the mistreatment of the Plaintiff and also encouraged Defendant-Ballenger, and Lieutenants Steve Ingram and Robert Hemphill to participate in the mistreatment of the Plaintiff.

97. Plaintiff has reported misconduct by Defendant-Ballenger (and others favored by Defendant-Gilbert) and has been directly retaliated against in response.

98. Former Detective Defendant-Perna is frequently calling others to gossip and spreads damaging falsehoods about Plaintiff, thereby contributing to the hostile working environment.

99. When Prosecutor Fiore was initially sworn in as the Prosecutor in November of 2017, Defendant-Perna arrived at the office and met with him, providing him with a federal court ruling from 2012 where a weapon was suppressed as a result of the Plaintiff's affidavit.

100.    Defendant-Perna attempted to have the Plaintiff classified as a Brady/Giglio Officer as a result of the court ruling and proceeded to say disparaging things about the Plaintiff to Prosecutor Fiore.

101.   Defendant-Perna again tried to argue his point with Assistant Prosecutor Alec Giuterrez who was handling the investigation related to the ruling at a later date while at the Gloucester County Police Academy.

102.   Defendant-Perna was advised that Superior Court Judge Kevin Smith, J.S.C. had written another court ruling in favor of the Plaintiff who advised that this ruling was not permitted in the proceedings on this case.   Despite learning of Judge Smith's ruling, Defendant-Perna was persistent in his pursuit against Plaintiff.

103.   The Plaintiff was approached by an employee of Gloucester County College where the Gloucester County Police Academy is housed and advised that Defendant-Perna was at the Police Academy saying disparaging things about the Plaintiff.

104.   The employee told Defendant-Perna to stop saying these things and told him it appeared he had a personal issue with the Plaintiff (because of her gender).

***Plaintiff Exercised Her Constitutional and Statutorily Secured Rights to Report Violations of Law, Rule, Regulation and/or Policy Regarding the Complaints against a GCPO Detective***

105.   On or about October 17, 2018, Defendant-Gilbert and Defendant-Ballenger were both made aware of a complaint against a Detective within the GCPO but did not initiate an investigation into this Detective.

106.   Instead, Defendant-Gilbert and Defendant-Ballenger attempted to have it handled as a Performance Deficiency which was in violation of the GCPO Internal Affairs Policy because of the nature of the alleged violation.

107. On or about November 16, 2018 the investigation was initiated and handled properly after Prosecutor Fiore was made aware of it and directed that an investigation be conducted.

108. Plaintiff conducted the investigation and completed the report which was submitted to Defendant-Gilbert for review.

109. The report determined that violations of the rules and regulations had occurred.

110. To this day, the report remains unapproved and the 45-day rule has lapsed meaning no discipline or corrective action was taken, despite the violation, all because Defendant-Gilbert refused to respond to the report prepared by Plaintiff.

111. Defendant-Gilbert claims he had issues with her report that were discussed with the Prosecutor, but never brought to her attention.

112. Nonetheless, Plaintiff sent multiple emails regarding this investigation and its status to follow up and attempt compliance with the law and received no answer, no guidance or direction and no conclusion.

113. Plaintiff reported and objected to the aforementioned non-compliance with the law, rules, regulations, and policies.

***In Retaliation, Defendant-Ballenger Excluded Plaintiff from Activities Relevant to Her Position***

114. On or about October 24, 2018, Victim Advocate Kris Gallagher and Plaintiff attended a bidder's conference to gather information related to grant funding for the Child Advocacy Center of Gloucester County.

115.   Following the October 24, 2018 meeting, Prosecutor Fiore determined that the GCPO would apply for the grant funding to lease and renovate the second floor of the Child Advocacy Center of Gloucester County where they would house the Special Victims Unit.

116.   On or about October 30, 2018, Defendant-Gilbert took Defendant-Ballenger to the CACGC to discuss the creation of the unit.

117.   Plaintiff was never asked to attend the meeting or participate in any way.

118.   On or about October 31, 2018, a tour of the second floor of the CACGC occurred with the realtor, Defendant-Gilbert, Defendant-Ballenger and Lt. Ingram.

119.   Defendant-Gilbert never spoke to Plaintiff about the tour or her attendance.

120.   Kris Gallagher and Plaintiff, however, were the women responsible for the grant funding and the creation of the first floor of the CACGC.

### *Defendant-Gilbert Covered for and Refused to Investigate Defendant-Ballenger*

121.   In or about October or November 2018, Defendant-Ballenger was watching a prisoner in Interview Room One on the first floor of the Gloucester County Prosecutor's Office when the prisoner took shoelaces and wrapped them around his neck in an attempted suicide.

122.   Defendant-Ballenger, who was supposed to be guarding the prisoner, instead, was outside the Interview Room drinking a cup of coffee.

123.   Defendant-Gilbert refused to permit an internal affairs investigation into the neglect of duty because of his relationship with Defendant-Ballenger and handled it as a Meaningful Review.

*Plaintiff Exercised Her Constitutional and Statutorily Secured Rights to Object to Defendant-Gilbert's Violations of Policy, Rule, Regulation, and/or Law*

124.   On or about November 2, 2018, there was an email exchange about a Constructive Energy Device ("CED") Military Order for a GCPO employee.

125.   Defendant-Gilbert inappropriately included multiple individuals on the email chain.

126.   Plaintiff responded by advising Defendant-Gilbert that the CED deployment was confidential because there is a review process that was required to be followed to determine if the rules and regulations for CED deployment were followed before such deployment could be granted.

127.   Defendant-Gilbert, unconcerned with policy or confidentiality, advised Plaintiff to do as she was told and directed that the deployment paperwork be given to him. He hung up the phone on her.

*As a Result of Plaintiff's Exercising of Her Constitutional and Statutorily Secured Rights, Defendant-Gilbert Continued to Retaliate Against Plaintiff*

128.   Plaintiff conducted an Internal Affairs Investigation into a domestic violence incident involving an Officer from a local municipality..

129.   In order for the Officer's Fitness for Duty to be conducted, the psychologist needed to review the internal affairs report prepared by Plaintiff.

130.   Defendant-Gilbert refused to approve the report because he was "busy."

131.   The Chief of the Municipality contacted Defendant-Gilbert and asked for the report to be approved so that the officer could return to duty.

132.    Defendant-Gilbert sent Plaintiff a nasty email saying he was upset with her behavior related to this incident and this behavior will never occur again.

**Defendant-Gilbert Treated Plaintiff Differently (Worse) than Her Male Colleagues Which Contributed to the Hostile Working Environment**

133.    Defendant-Gilbert regularly required Plaintiff to submit her reports in writing to him for review and correction. He would correct them manually, return them and ask to see the report again to assure the Plaintiff made the changes he suggested, yet, he did not require her male counterparts, who filled the position after the Plaintiff left, to do so.

134.    On or about November of 2018 Defendant-Gilbert asked Plaintiff to give a policy she prepared dealing with the internal affairs Early Warning System in accordance with Attorney General Directive 2018-3 to Defendant-Ballenger, Sgt. Ingram and Sgt. Hemphill to review before he would even look at it.

135.    Defendant-Gilbert required the men to review any policies or documents that Plaintiff prepared, yet to this day, Plaintiff has not been asked to review any of their work.

136.    Defendant-Ballenger has no internal affairs experience except as a subject or witness officer.

137.    These men made recommended changes to the policy, mostly grammatical, and Defendant-Gilbert praised them for their input, yet, never acknowledged the work that Plaintiff did in actually preparing the Policy.

138.    Moreover, it took Defendant-Gilbert 8 months to finally approve this policy.

**Defendant-Gilbert Began Giving Plaintiff's Work to Lesser-Qualified Men Which Further Contributed to the Hostile Working Environment**

139.    Plaintiff was involved in an internal affairs investigation regarding an Officer who was accused of using his authority as an officer in two road rage incidents.

140.    Defendant-Gilbert inexplicably asked Defendant-Ballenger and Sgt. Hemphill to attend the briefing with the Prosecutor on the case for details.

141.    During the meeting, Defendant-Gilbert directed that Plaintiff report to Defendant-Ballenger and Hemphill about the case and work with the Detectives from the Major Crimes Unit.

142.    Following the meeting, First Assistant Prosecutor Paul Colangelo contacted Plaintiff and asked her why Defendant-Ballenger and Hemphill who were Major Crimes Unit supervisors were included in the meeting on a confidential matter.

143.    Following a conversation with Colangelo and Plaintiff, Defendant-Ballenger and Hemphill were removed from the investigation.

144.    While in the Special Investigations Unit, information was developed on Plaintiff's thirteen-year-old homicide that was currently in trial motions.

145.    Defendant-Gilbert learned of it and directed Plaintiff to brief Defendant-Ballenger and Sgt. Hemphill so they can assess what was required for the trial.

146.    Defendant-Gilbert attempted to push Plaintiff out of the trial work; however, Assistant Prosecutor Alec Gutierrez requested Plaintiff complete her assignment without interference from Defendant-Ballenger and Hemphill.

147.    The case ultimately went to trial and the State won the case. Yet, Defendant-Gilbert refused to acknowledge Plaintiff for her work but did thank the male Assistant Prosecutor, Alec Gutierrez.

148. While in the Special Investigations Unit, as the Accreditation Manager for the NJSACOP Accreditation, Defendant-Gilbert required that Plaintiff's work be reviewed by Sgt. Hemphill and Sgt. Ingram.

149. Significantly, Plaintiff has never been assigned as a subordinate to either Sgt. Hemphill or Sgt. Ingram.

150. In reference to accreditation, to date, since his hire date of February of 2018, Defendant-Gilbert has not reviewed or acknowledged any policy or procedure in excess of 400 in the Power DMS database.  It is required that all County Detectives read, review and acknowledge the same.

151. These policies and procedures govern the day to day operations of the GCPO and as the Chief of County Detectives he is responsible for the adherence to these policies and procedures and the discipline that would result in their violation.

152. On or about November 2018, Defendant-Gilbert transferred and re-assigned Det. Wilden without discussing it with her in advance. Indeed, she learned of the transfer through an email.

153. This transfer and reassignment was perceived as punishment to Plaintiff as it left a very heavy burden on her as the sole person responsible for Internal Affairs for Gloucester County and the manager of the re-accreditation (which she did the bulk of the work for because of her brains and acumen but received none of the praise that Defendant-Gilbert gave to less deserving males in the department).

154.    During Plaintiff's assignment in the Special Investigations Unit, Defendant-Gilbert
lectured Plaintiff many times that Chief John Porter and Prosecutor Sean Dalton were fired
and that Senator Sweeney and Senator Madden have him here to fix things.

155.    Defendant-Gilbert continually spoke negatively to Plaintiff about the "old
administration."   He told Plaintiff during one of these lectures that she needed to "drink the
Kool Aid" if she was going to make it around here.  The inappropriate references to politics
are not in keeping with the Local Government Ethics Laws.

156.    On Monday, September 17, 2018 in the supervisor meeting and in the presence of
Defendant-Ballenger and Sgts. Malesich, Ingram, Hemphill, Koller and the Plaintiff,
Defendant-Gilbert announced that he heard that people were starting rumors that he is
taking Senator Fred Madden's position at the Gloucester County Police Academy.

157.    Defendant-Gilbert advised that while he thought it was a compliment that people would
think he could do Senator Madden's job, the Senator was aware of the rumors and was not
happy.   He said that we better "watch ourselves" because we do not know who we are
messing with; Senator Madden is head of the Democratic Party.

158.    Plaintiff reported to Defendant-Gilbert that violations of law, rules, regulations, and
policy were reported to her by Captain Robert Pietrzak during the accreditation process by
a Supervisor and other members of the GCPO.

159.    Defendant-Gilbert suggested a meeting with Prosecutor Fiore and both he and
Defendant-Gilbert agreed to initiate an internal affairs investigation into the matter.
Plaintiff assigned the investigation to be handled by Det. Wilden.

160.    The Plaintiff heard allegations that she was targeting the Lieutenants which she believed stemmed from Defendant-Gilbert.

161.    In a supervisor meeting, Defendant-Gilbert apologized to a Supervisor that the Plaintiff had investigated previously for harassment and stated that the Plaintiff's investigation was "fucking bullshit." Defendant-Gilbert apologized for it and blamed the past administration-again undermining Plaintiff's role in the Internal Affairs Unit.

162.    On or about December 1, 2018 Defendant-Gilbert attempted to cut Plaintiff out of another assignment when he sent an email about the creation of the Special Victims Unit requesting that Defendant-Ballenger formulate "con ops" for the unit since it will be under his command.

163.    Prosecutor Fiore responded that Plaintiff was in charge of the unit and that she was working with First Assistant Prosecutor Colangelo and Assistant Prosecutor Rolando in that regard.

***The Retaliation Against Plaintiff by Defendant-Ballenger and Defendant-Gilbert Continued and Worsened Thereby Furthering the Hostile Working Environment***

164.    On or about December 7, 2018, Prosecutor Fiore advised Plaintiff that an anonymous letter was written (author appeared to be Defendant-Ballenger and company) stating that Plaintiff spoke poorly of women during the hiring process in order to manipulate the hiring process to benefit another female Detective (because Plaintiff's husband is friends with this Detective's father).

165.    In July of 2016, another anonymous letter (author appeared to be Defendant-Ballenger and company) was written about Plaintiff to former Prosecutor Dalton that alleged similar

conduct by Plaintiff, i.e., that she spoke ill of an Elk Township Detective. The letter also stated that Plaintiff should not be in Internal Affairs when she was at the time, applying for Sergeant. It is not coincidental that during promotions another letter surfaced.

166.    On December 7, 2018, Det. Garbarino advised Det. Wilden and Plaintiff that he had contacted Defendant-Ballenger who was with Defendant-Gilbert to brief them on a sexual assault.

167.    Defendant-Ballenger and Defendant-Gilbert told Garbarino to assign Plaintiff and Det. Wilden to handle the investigation because there were no available personnel in the Major Crimes Unit to investigate the matter.

168.    Plaintiff subsequently walked over to the Major Crimes Unit and there were five Detectives at their desks.  Even they could not understand why the Internal Affairs Unit was being assigned a sexual assault when they were all present and available.

169.    Plaintiff emailed Prosecutor Fiore and advised him that this behavior was retaliatory.

170.    Prosecutor Fiore emailed Defendant-Gilbert and said that Plaintiff and Wilden were not to be assigned any investigation outside of the Special Investigations Unit.

171.    Defendant-Gilbert and Defendant-Ballenger also had a Detective assigning another Sergeant an investigation not related to their unit.

172.    In and around this time frame, Det. Garbarino and Det. Bates advised Plaintiff that Sgt. Hemphill was telling the Detectives in the Major Crimes Unit that they should not be seen talking to her or to be in Plaintiff's office because associating with Plaintiff was "bad for their career."

173.   Det. Garbarino and Det. Bates advised Plaintiff that they reported this to her because Plaintiff taught them when she was in the Major Crimes Unit and Sgt. Hemphill's behavior upset them.

174.   On or about December 13, 2018, Defendant-Ballenger requested a case analysis of sexual assault investigations from the members of the Major Crime Unit.  These statistics were being compiled to determine if the newly created Special Victims Unit could justify duty coverage.

175.   Defendant-Ballenger attempted to alter the statistics by asking for jobs that come in after hours and not the calls that come in at the end of the day which are normally assigned to the duty detective and generate overtime.

176.    The Detectives prepare their statistics and forward them to Defendant-Ballenger.

177.    Defendant Ballenger and Sgt. Hemphill were overheard saying that the officers were attempting to falsify statistics.

178.   A meeting was then scheduled to address the Special Victims Unit duty coverage and in attendance were Prosecutor Fiore, Colangelo, Rolando, Defendant-Gilbert, Captain Pietrzak, Defendant-Ballenger, Sgt. Hemphill, Sgt. Malesich, and Plaintiff.

179.   Prior to the beginning of the meeting, the Detectives in the Major Crimes Unit overheard Defendant-Gilbert tell Defendant-Ballenger and Sgt. Hemphill that they need to alter the statistics and stick together so they get what they want and that the SVU Detectives don't go on call.

180.　In 2018, Plaintiff fell under the direct supervision of Defendant-Gilbert due to her assignment in the Special Investigations Unit.　Therefore, Defendant-Gilbert was responsible for her yearly performance evaluation.

181.　To date, Defendant-Gilbert has not provided Plaintiff with an evaluation, which all other officers in the department received.

182.　Defendant-Gilbert, as Plaintiff's direct supervisor while in the Special Investigations Unit,　never reported any concerns to Plaintiff concerning any issues or concerns with her work product or report writing.

183.　Defendant-Gilbert lectured to the newly assigned Sergeant and Detective of the Special Investigations Unit, stating that he did not want the internal affairs matters handled the way the Plaintiff and Detective Wilden handled  matters.

184.　The newly assigned Supervisor subsequently sent an email to all of the Municipal Chiefs of Police insinuating that Plaintiff's unit had no integrity prior to him assuming control of it.

185.　The Plaintiff was advised by individuals who received the email correspondence that they were shocked that he was permitted to send the email indicating that there were issues with how internal affairs matters had been handled.

186.　The Plaintiff was well known to these individuals as someone who would provide guidance, direction and assistance in these matters due to her knowledge and experience of the subject.

187.  Plaintiff never initiated an internal affairs investigation without a complaint filed by an outside party or internal officer and never without being ordered to investigate these complaints by Prosecutor Fiore or Defendant-Gilbert.

188.  On September 2, 2018, the Plaintiff was contacted by a Detective from the Major Crimes Unit regarding a missing 9-year-old boy.  As the Child Abduction Response Team Coordinator, the Plaintiff responded to assist in locating the child.   The Plaintiff responded and searched and found the child in five hours.

189.  Following the investigation, Defendant-Gilbert thanked the Detective for his involvement. Defendant-Gilbert never acknowledged Plaintiff's response or efforts in locating the child, but instead asked her to submit a timeline of her response.

190.  Defendant-Gilbert has asked no male Detective to submit a timeline of events in a case after responding in an investigation.  Prosecutor Fiore commented on Defendant-Gilbert's differential treatment of the Plaintiff in this matter.

191.  On or about February 14, 2019, Plaintiff contacted Defendant-Gilbert in reference to a Special Victims Unit case where a student at a High School was involved in a sexual relationship with a teacher.

192.  Defendant-Gilbert stated to Plaintiff "how does the Superintendent look here? Do you know who he is? He is a very important person. He is a Freeholder for the County and is an up and coming politician." Plaintiff responded, "okay."

193.  Plaintiff nonetheless arrested the teacher in May 2019. Prior to the arrest, Plaintiff had to prepare a press release that she sent for approval through her chain of command.

194.   Defendant-Gilbert suggested that she get a quote from the Superintendent for the press release and have him review the press release prior to its dissemination.

195.   At Defendant-Gilbert's direction, Plaintiff forwarded the Superintendent a draft copy of the press release.

196.   Plaintiff emailed his draft to Defendant-Gilbert and Prosecutor Fiore and told them she was not comfortable with the draft prepared by the Superintendent.  Prosecutor Fiore agreed with Plaintiff and said to release her original version.

197.   Defendant-Gilbert later told Plaintiff that the Superintendent would not be happy about this, but it was Prosecutor Fiore's fault, not his.  This is highly unprofessional behavior and shows the level of discord within the GCPO.

198.   On or about March 4, 2019, in a supervisor meeting, Plaintiff reported the statistics for the Special Victims Unit and informed that the unit was busy adhering to the new Attorney General Directive and the influx and reporting of cases since the creation of the unit.

199.   Afterwards, Defendant-Gilbert asked how much of their work was "gun and badge" work.  He also questioned Plaintiff, undermining her position, by conducting an interrogation of her in front of all of the supervisors.

200.   Defendant-Gilbert did not question any male supervisors about what they reported and it was all very general information, not worthy of such an interrogation.

201.   Plaintiff was approached afterwards by numerous supervisors saying they could not believe his behavior towards her.

202.   On or about March 25, 2019, at a supervisor's meeting, Plaintiff was excluded from attending but learned that Defendant-Gilbert gave instructions to disregard a Special Memo about the Special Victims Unit ("SVU").

203.   Once Plaintiff learned of this information, she reported it to Prosecutor Fiore and advised him that she has been reporting how busy the SVU was since its creation and has asked for help multiple times.

204.   Prosecutor Fiore advised Plaintiff that Defendant-Gilbert completely undermined his authority.  Fiore stated he would speak to Defendant-Gilbert.

205.   On or about April 1, 2019, at the next supervisor meeting, Defendant-Gilbert changed the seat he normally sits in and sat two seats from Plaintiff and began threatening whoever went to Prosecutor Fiore about the SVU memo, saying they were unprofessional and should be ashamed of themselves.

206.   Defendant-Gilbert said he did that on purpose to "test" this person to see how long it would take them to report it to him and it took them one hour.

207.   Defendant-Gilbert further advised that he knows he is not well liked or respected and he does not care.  He added that he "volunteers' here.  He said that whoever is reporting things to the Prosecutor is "ruining their career."

208.   On or about May 16, 2019, Defendant-Gilbert had a meeting with Defendant-Ballenger, Hemphill, and Ingram to review the resumes for hiring a new employee but failed/refused to include Plaintiff, who should have been in attendance, in the process.  Lt. Ronald Koller was also left out and Lt. Ingram contacted him and apologized.   The Plaintiff never received a call and only learned of the meeting after Lt. Koller told her.

209. On or about June 25, 2019, Plaintiff was contacted by the Washington Township Police Department in reference to a Prostitution Detail scheduled for July 9, 2019.

210. Plaintiff offered to assist with the interviews of the prostitutes to determine if they were human trafficking victims.

211. An email was sent to Plaintiff and Lt. Ingram with the final ops plan to include the SVU participation.

212. On or about June 26, 2019, at 0642 hours, Defendant-Gilbert sent an email regarding "operational obligations" which was clearly intended to berate Plaintiff for her offer to assist in the project. Plaintiff had only agreed to it late afternoon the day before and due to other work obligations had not had time to advise the chain of command.

213. Lt. Ingram is the only one who would have reported this to Defendant-Gilbert as he was the only other person included on the email chain.

214. The email stated that he had to be notified of the commitment to operations.

215. Plaintiff emailed Defendant-Gilbert back and told him that she knew that email was meant for her.

216. As a commanding officer of a unit, Plaintiff reasonably believed that she had the ability to commit to assist a municipality without permission from Defendant-Gilbert.

217. No other unit has to receive permission from Defendant-Gilbert before assisting local partners with something as simple as interviews of potential victims.

218. This is one of many examples of Defendant-Gilbert's retaliation against Plaintiff and differential treatment of her because she is a woman.

219.   On or about July 1, 2019, a meeting was scheduled regarding compliance with Attorney General Directive 2018-5.

220.   Defendant-Gilbert sent Plaintiff an email requesting that she prepare a "briefing doc" on her concerns for the meeting in priority order and recommendations for remedies.

221.    Plaintiff, therefore, prepared the "briefing doc" which outlined her expectations of the meeting and included policies and the Attorney General Directive.

222.   Defendant-Gilbert never responded to her written communication. It was obvious that he also did not read any of the documents she forwarded to him in preparation for the meeting.

223.   Defendant-Gilbert kept asking about what the policy and directive states.

224.   This is another example of Defendant-Gilbert creating "busy work" for Plaintiff which takes her away from the work required of her command.

225.   Following the meeting, a member of the meeting approached Plaintiff and said she doesn't know how she deals with him on a daily basis because he does not know what he is talking about and keeps asking the same questions that can be answered by reading or knowing the policies and directives that guide these investigations.

226.   In reference to a Special Victims Unit Investigation that was assigned to a Detective in the Special Victims Unit, Defendant-Gilbert requested that he be briefed on the investigation by Plaintiff before it went "operational."

227.   Plaintiff attempted to meet with Defendant-Gilbert, but could not locate him in the office and was busy following the death of Lt. Langdon Sills.

228. Without her knowledge, Assistant Prosecutor Rolando scheduled a meeting with Prosecutor Fiore regarding the investigation.

229. Plaintiff telephoned Defendant-Gilbert and he did not answer, so she sent him a text message explaining that the meeting was scheduled without her knowledge.

230. Defendant-Gilbert responded, "Whatever. It was known I have the CIT Planning mtg at 10a."

231. Plaintiff responded that "we would not do anything until he was briefed," to which he replied, "My perspective is moot. Do whatever you are told."

232. No other unit has had to review a sexual assault investigation with the Chief of Detectives prior to meeting with an attorney for charging.

233. Following the preceding text messages, while Defendant-Gilbert has responded to various emails by Plaintiff, he did not speak to her in person for over a month.

234. On or about August 1, 2019, at 1400 hours, Plaintiff was walking up the stairs to the second floor and Defendant-Gilbert was walking in front of her.  Defendant-Gilbert looked at her, kept walking and let the door shut in front of her.

235. Defendant-Gilbert then walked into the area of Plaintiff's unit, approached Det. Hoyle and Det. Hogan, high fived them, asked them how his "A Team" was doing.

236. Plaintiff walked past him towards her office and Defendant-Gilbert completely ignored Plaintiff (who apparently is not on Gilbert's "A" team).

237. Defendant-Gilbert has never once come to Plaintiff's unit or seen her office since its creation in January of 2019.  His behavior towards the Plaintiff and the members of her unit has been noted and discussed amongst the members of the SVU.

238. On December 18, 2019, Defendant-Gilbert visited the Special Victims Unit at the Child Advocacy Center of Gloucester County where the unit had been recently relocated and had occupied for six weeks with no acknowledgement from Defendant-Gilbert.

239. Upon arriving at the CACGC, Defendant-Gilbert began to question Plaintiff about her preparedness for child abductions since she is and has been the coordinator since 2008.

240. Plaintiff reviewed her policy and procedures and Defendant-Gilbert advised her that he felt comfort when Defendant-Ballenger, Hemphill, and Ingram (males) are on scenes.

241. Again, Defendant-Gilbert acknowledged the male Lieutenants. and never acknowledged the female Plaintiff's knowledge, experience, and expertise in this field.

***Defendant-Perna Contributed to the Retaliation, Discrimination, and Hostile Working Environment***

242. Defendant-Perna has caused trouble for Plaintiff for years due to his close relationship to several officers that have been investigated by Plaintiff while in the Special Investigations Unit, and her exercising of her Constitutionally protected and statutorily secured rights pursuant to those investigations.

243. In retaliation for her reports, Defendant-Perna has spread false, malicious and damaging statements about Plaintiff and these statements are directly connected to a retaliatory animus by Defendant-Perna because he believes that Plaintiff "cost" Defendant-Ballenger a Deputy Chief promotion due to her last investigation of Defendant-Ballenger which resulted in disciplinary action.

244. Defendant-Perna jokingly refers to the "smear campaign" against Plaintiff.

*Defendant-Gilbert and Defendant-Ballenger Have Refused to Provide Plaintiff With Adequate Resources to Do Her Job Most Effectively*

245.    Since the inception of the Special Victims Unit in 2019, the Plaintiff has continually requested additional personnel to handle the excessive caseload.

246.    Whenever the Plaintiff would request assistance, Defendant-Gilbert would ask all of the units to prepare action or strategic plans outlining their workload..

247.    The Plaintiff would provide the plans in accordance with the request and still would not receive assistance.

248.    The other units were not required to submit strategic or actions plans when they requested assistance, only the Plaintiff.  Therefore, they would become upset with her for making the request. Some of the supervisors would advise the Plaintiff that they could not believe the administration would not provide her with the help requested and instead continually required her to justify it, which the Plaintiff was able to do.

249.    There were three new hires acquired by the office since the inception of the unit, one being a former Special Victims Unit Detective that is Spanish speaking.

250.    The Major Crimes Unit was assigned two Detectives and the Narcotics Unit was assigned one Detective.

251.    The needs of the Special Victims Unit outweigh the needs of the other units yet Plaintiff's requests were still ignored.

252.    During a conversation regarding staffing with Prosecutor Fiore, he assured the Plaintiff that she was getting help because he knew that Defendant-Gilbert wanted her to fail and that he would not allow it since the Special Victims Unit was his creation.

253.   On multiple other occasions, Defendant-Ballenger and Defendant-Gilbert have refused to provide Plaintiff with the personnel and/or resources she needed.

254.   For example, on or about December 19, 2019, Det. McCausland was assigned to investigate a physical abuse case. The children were present at the CAC and had visible injuries that were required to be photographed.

255.   Since Defendant-Ballenger oversaw the Crime Scene Unit, the Plaintiff contacted him and requested a CSI Detective to photograph the child's injuries.

256.   Defendant-Ballenger told the Plaintiff that he could not help her and that she had to call Sergeant Greg Malesich.

257.   It should be noted that Sergeant Malesich was on vacation and Defendant-Ballenger was overseeing the Crime Scene Unit in his absence.

258.   Plaintiff contacted Sergeant Malesich and did not get an answer, so she then attempted to contact multiple Detectives in CSI with no answer until she ultimately spoke with Det. Yader Barquero who told the Plaintiff he would send someone to the CAC.

259.   Det. Brie Renner arrived at the CAC and advised that Defendant-Ballenger was in the main office and she could not believe that he would not walk into the CSI Unit and send someone over to help.

***Plaintiff Submitted Another Formal Complaint of Discrimination and Violations of her Rights***

260.   On or about January 27, 2020, Plaintiff did issue a formal complaint, through counsel, reporting, objecting to, and disclosing the gender discrimination, and violations of statutory and Constitutional rights set forth in the preceding paragraphs to the Office of the Attorney General, the Gloucester County Counsel, and the Gloucester County Prosecutor.

261.    Another female employee of the GCPO filed a complaint against the GCPO, County, and others in the Gloucester County Superior Court on or about March 9, 2020 alleging, among other things, sexual harassment.

262.    Despite multiple reports by Plaintiff and a legal Complaint by another female employee, the GCPO and County have taken no steps to investigate their complaints or taken any prompt or remedial action as required under New Jersey law.

263.    Regardless of Plaintiff's report, the retaliation and discrimination continued.

264.    In February of 2020, Plaintiff contacted Defendant-Ballenger and requested the assistance of a Spanish speaking Detective in his unit to translate for a Spanish speaking family related to an SVU investigation.

265.    Defendant- Ballenger asked Plaintiff why she was calling him and said "don't call me, call the Detective and ask him." It should be noted that there is a chain of command, and Defendant-Ballenger again did not want to assist Plaintiff.

266.    On or about March 15, 2020 the Special Victims Unit responded to an Amber Alert for three children out of Franklin Township.

267.    Defendant-Gilbert contacted the Plaintiff while she was en route to the Franklin Township Police Department and told her that she could call in any resources necessary to assist.

268.    Defendant-Gilbert arrived on scene a few hours later. He instructed Plaintiff to contact Lt. Hemphill and advise him what was going on, so she asked why the Plaintiff had to call him and he responded, "Because I told you to do it, now DO IT."

269.     The Plaintiff called Lt. Hemphill and told him that Defendant-Gilbert made her call him and she did not know why.

270.     Plaintiff was required to contact another (male) Lieutenant on scene; however, no one has ever had to call her (a female) when they were out on scene.

271.     When the children were recovered safely, Defendant-Gilbert stood in the Detective Bureau and said that the children were found safe because of the work of the Franklin Township Police Department and the New Jersey State Police.

272.     Defendant-Gilbert again refused to acknowledge the work of the Plaintiff and SVU who were present and assisted.

273.     On Thursday, March 5, 2020, Prosecutor Fiore announced his resignation and his replacement was named.  At that time, Defendant-Gilbert held a meeting with the command staff at the main office regarding what was transpiring and what was planned for the transition.

274.     The Plaintiff was excluded from this meeting and was not made aware of anything that was occurring in that meeting.

275.     The Plaintiff contacted Defendant-Gilbert and confronted him for holding the meeting without her present and he lied and said he grabbed whoever was in the hallway.

276.     It should be noted that Lt. Ingram works in a separate building but was present for the meeting.

277.     On or about March 24, 2020 at 1204 hours, Plaintiff received a telephone call from former Prosecutor Fiore who advised her that there was a "hit list" from the politicians of people he was supposed to get rid of during his term.

278.    Former Prosecutor Fiore advised the Plaintiff that Sean Dalton's former "A Team" including Chief Porter, Captain Pietrzak, Det. Nick Schock, Det. John Petroski, Det. Wilden and the Plaintiff were on the "hit list."  This was confirmed by Chief of Staff Brett Schmidlin who also advised Captain Pietrzak of those named on the "hit list."

279.    To reiterate, Plaintiff's name was on this "hit list."

## LEGAL CLAIMS

### COUNT I

*New Jersey Law Against Discrimination-*

*Retaliation in Violation of N.J.S.A. 10:5-1 et seq.*

*(Against all Defendants)*

280.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

281.    The LAD makes it illegal "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act..." *N.J.S.A.* 10:5-12(d).

282.    Defendants are "employers," "supervisors," and "persons" under the definitions contained within the LAD.

283.    Plaintiff is a female and employee of Defendants who was subjected to harassment, discrimination, and a hostile working environment.

284.    Plaintiff engaged in protected activity known to the employer-Defendants, by reporting

harassment, gender discrimination, and a gender-based hostile working environment.

285.    Plaintiff was subjected to adverse employment decisions and actions including, but not

limited to: loss of status, a clouding of job responsibilities, diminution in authority,

disadvantageous transfers or assignments, and/or toleration of harassment by other

employees.

286.    Plaintiff's engagement in protected activity did cause, both directly and proximately,

the adverse employment actions against her, and thereby reputational and financial loss,

back pay, and front pay.

287.    Plaintiff's protected activity was both reasonable and made in good faith.

288.    Any proffered reason for these adverse employment actions against Plaintiff shall be

shown to be pretext.

## COUNT II

### *New Jersey Law Against Discrimination-*

### *Gender-Based Hostile Working Environment in Violation of N.J.S.A. 10:5-1 et seq.*

### *(Against all Defendants)*

289.    All of the foregoing and subsequent paragraphs are incorporated herein by this

reference as if stated here in their entirety.

290.    Plaintiff is a female.

291.    Defendants are "employers," "supervisors," and "persons" under the definitions

contained within the LAD.

292.    Plaintiff has suffered from conduct that occurred because of her sex.

293.    A reasonable woman would consider such conduct sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment.

294.    Plaintiff reported the conduct.

295.    The Defendants did not investigate the conduct or take any prompt or reasonable steps to remediate the conduct.

296.    Plaintiff has continued to suffer from the hostile environment, and has suffered damages because of it including, but not limited to: loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees, reputational and financial loss, back pay, and front pay.

297.    As a result of this conduct, Plaintiff has suffered stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry, high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

## COUNT III

### *New Jersey Law Against Discrimination-*

### *Disparate Treatment in Violation of N.J.S.A. 10:5-1 et seq.*

### *(Against all Defendants)*

298.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

299.     The LAD, at *N.J.S.A.* 10:5-12(a), prohibits among other things, an employer from discriminating against employees on the basis of gender.

300.   Defendants are "employers," "supervisors," and "persons" under the definitions contained within the LAD.

301.   Plaintiff was, at all times relevant, an employee who could and did perform her job functions satisfactorily.

302.   Plaintiff is a female.

303.   *N.J.S.A.* 10:5-4 prohibits discrimination in the workplace and states: "All persons shall have the opportunity to obtain employment … without discrimination because of … sex … subject only to conditions and limitations applicable alike to all persons.  This opportunity is recognized as and declared to be a civil right."

304.   Defendants did subject Plaintiff to differential, worse, and intentionally discriminatory treatment based on her gender, as set forth in the preceding paragraphs.

305.   As a direct and proximate cause of Defendants' LAD violations,  Plaintiff has suffered damages because of it including, but not limited to: loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees,  reputational and financial loss, back pay, and front pay.

306.   The adverse employment actions by Defendants also caused Plaintiff to suffer stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry, high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

307.   Any reason proffered by Defendants for their disparate treatment of Plaintiff shall be shown to be pretext.

## COUNT IV

### *New Jersey Law Against Discrimination-*

### *Aiding and Abetting  in Violation of N.J.S.A. 10:5-1 et seq.*

### *(Against all Defendants)*

308.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

309.   The LAD, *N.J.S.A.* 10:5-12(e) makes it illegal for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so.

310.   The Defendants aided each other with performing wrongful acts that did cause injuries to Plaintiff.

311.   The Defendants were aware of their role as part of the overall illegal activity at the time each provided the assistance to the other.

312.   The Defendants knowingly and substantially assisted each other in the principal violations of the Law Against Discrimination.

313.   As a direct and proximate cause of Defendants' LAD violations, including aiding and abetting each other,  Plaintiff has suffered damages because of it including, but not limited to:  loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees, reputational and financial loss, back pay, and front pay.

314.    The actions by Defendants also caused Plaintiff to suffer stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry, high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

## COUNT V

*New Jersey Civil Rights Act*

*N.J.S.A. 10:6-2 et seq. is violated pursuant to Defendants deprivation of and interference with Plaintiff's New Jersey State Constitutional rights including those found at Article I, ¶¶1, 2, 6, 18 & 19, and her statutorily implemented rights pursuant to N.J.S.A. 40A:14-181, and the thereby implemented and secured Internal Affairs Policies & Procedures*

*(Against all Defendants)*

315.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

316.    Defendants are public employers and/or public officials with final policy making authority as it pertains to the governance of the operations of the GCPO.

317.    The Plaintiff engaged in protected public concern activity and political affiliation under the New Jersey Civil Rights Act, *N.J.S.A.* 10:6-2.

318.    *N.J.S.A.*10:6-2(c) provides relief for either the deprivation of a statutory substantive right or the interference with such a right by threats, intimidation or coercion. *Tumpson. v. Farina*.

319.    *N.J.S.A.* 10:6-2(c) provides: ***Any person who has been deprived of any substantive due process*** or equal protection rights, privileges or immunities secured by the ***Constitution or laws of the United States***, ***or any substantive rights, privileges or immunities secured by***

*the Constitution or laws of this State*, or whose exercise or ***enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law,*** may bring a civil action for damages and for injunctive or other appropriate relief. The penalty provided in subsection e. of this section shall be applicable to a violation of this subsection.

320.    The CRA is "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights (42 U.S.C.A. § 1983). *Ramos v. Flowers, 429 N.J. Super. 13 (2012).*

321.    The New Jersey Constitution provides "All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right at all times to alter or reform the same, whenever the public good may require it." [N.J. Const. art. I, ¶ 2.]

322.    "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." [N.J. Const. art. I, ¶ 6.]

323.    "The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances." [N.J. Const. art. I, ¶ 18.]

324.    "Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing." [N.J. Const. art. I, ¶ 19.]

325.   In *State v. Schmid,* 84 N.J. 535, 557, 423 A.2d 615 (1980), appeal dismissed sub nom., *Princeton Univ. v. Schmid*, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982), the New Jersey Supreme Court characterized those provisions as "***more sweeping in scope than the language of the First Amendment.***" See also *N.J. Coal. Against War in the Middle E. v. J.M.B. Realty Corp.*, 138 N.J. 326, 353 (1994) (the New Jersey Constitution provides free speech guarantees "broader than the right against governmental abridgement of speech found in the First Amendment"), *cert. denied*, 516 U.S. 812, 116 S.Ct. 62, 133 L.Ed.2d 25 (1995).

326.   "No monetary value we place upon constitutional rights can measure their importance in our society or compensate a citizen adequately for their deprivation.'" *Herrera v. Valentine*, 653 F.2d 1220, 1227 (8th Cir. 1981).

327.   The acts as described in more detail above demonstrate violations by Defendants of Plaintiff's substantive rights under the New Jersey Constitution, Article I, ¶¶ 2, 6, 18 and 19.

328.   Plaintiff is an intended beneficiary of the New Jersey Constitution.

329.   Plaintiff spoke out and acted on matters of public concern as a private citizen and not as part of her official duties.

330.   Plaintiff also opposed and/or refused to participate in activities in violation of laws, rules and/or regulations but were viewed by Defendants as antithetical to their political beliefs, allies, and/or motives.

331.   At all times relevant, Plaintiff was engaged in a Constitutionally protected activity.

332.    The New Jersey Civil Rights Act, *N.J.S.A.* 10:6-2, et seq., provides a mechanism to assert statutory claims that do not otherwise have a legal remedy enforcement provision.

333.    *N.J.S.A.* 40A:14-181 provides that "Every law enforcement agency, including a police department of an institution of higher education established pursuant to P.L.1970, c. 211 (C.18A:6-4.2 et seq.), shall adopt and implement guidelines which shall be consistent with the guidelines governing the "Internal Affairs Policy and Procedures" of the Police Management Manual promulgated by the Police Bureau of the Division of Criminal Justice in the Department of Law and Public Safety, and shall be consistent with any tenure or civil service laws, and shall not supersede any existing contractual agreements."

334.    Pursuant to *N.J.S.A.* 40A:14-181, the Attorney General Guidelines, including the Internal Affairs Policies & Procedures have been promulgated and secured pursuant to New Jersey law.

335.    The Internal Affairs Policies & Procedures provide that:

> The purpose of the internal affairs unit is to establish a mechanism for the receipt, investigation and resolution of officer misconduct complaints. The goal of internal affairs is to ensure that the integrity of the department is maintained through a system of internal discipline where an objective and impartial investigation and review assure fairness and justice.

> The internal affairs unit or officer will investigate alleged misconduct by members of the department and review the adjudication of minor complaints handled by supervisors.    In addition, internal affairs shall be notified of and document all firearms discharges by department personnel that are not related to training, all use of force incidents that result in injury to a defendant or a third party, all vehicular pursuits undertaken by department personnel and all collisions involving department vehicles. Once notification has been received, internal affairs will determine whether additional investigation is necessary.

> An internal affairs unit has an obligation to investigate or review any allegation of employee misconduct that is a potential violation of the agency's rules and regulations or that indicates the employee is unable,

unwilling or unfit to perform his or her duties.  The obligation to investigate includes not only acts of misconduct  that are alleged to have occurred while the subject officer was on-duty, but also acts of misconduct that are alleged to have occurred outside the employing agency's jurisdiction or while the subject officer was off-duty.

An internal affairs unit may conduct an internal investigation on its own initiative or upon notice to or at the direction of the law enforcement executive or the internal affairs supervisor. Internal affairs may refer investigations to the employee's supervisor for action as permitted by department policy and procedures.  *Id.* at 12.

336.    Defendants did interfere and deprive Plaintiff of her statutorily implemented and secured rights by interfering and depriving her of her ability to conduct internal affairs investigations in accordance with the Attorney General Guidelines and Internal Affairs Policies & Procedures by retaliating against her and interfering with her rights in the manner set forth in the preceding paragraphs.

337.    Plaintiff is an intended beneficiary of the Attorney General Guidelines and the Internal Affairs Policies & Procedures.

338.    At all times relevant, Defendants acted under color of state law.

339.    At all times relevant, Defendants knew or should have known of Plaintiff's New Jersey State Constitutional rights including those found at Article I,  ¶¶1, 2, 6, 18 and 19, and her statutorily secured rights of the Internal Affairs Policies & Procedures, and Attorney General Guidelines.

340.    Defendants did interfere with and deprive Plaintiff of said rights for having objected to, spoken out against, expressed opposition to, and for having disclosed violations of law, statute, policy, and regulation.

341.    Defendant-Gilbert was  delegated with authority by the Defendant-County and/or the
Defendant-GCPO to make and implement policy.

342.    Defendant-Ballenger was  delegated with authority by the Defendant-County and/or the
Defendant-GCPO to make and implement policy

343.    Defendant-Perna was  delegated with authority by the Defendant-County and/or the
Defendant-GCPO to make and implement policy

344.    Defendants Gilbert, Ballenger, and Perna carried out employment decisions on their
own and independently, and in the course of their respective employment and, at the
direction of the Defendant-County and/or the Defendant-GCPO

345.    Defendants Gilbert, Ballenger, and Perna's employment actions and those actions taken
on behalf of the Defendant-GCPO and/or Defendant-County are therefore imputed to the
County.

346.    The Defendant-County and Defendant-GCPO are liable for their own independent acts
in failing to conduct effective and unbiased investigations, and for failing to take prompt
and remedial actions under the anti-discrimination and anti-retaliation laws found within
*N.J.S.A.* 10:5-1 et seq., and, *N.J.S.A.* 10:6-2.

347.    The conduct of Defendants violated, interfered with, and deprived the Plaintiff of
clearly established New Jersey Constitutionally protected and statutorily secured rights
including those found at Article I,  ¶¶1, 2, 6, 18 and 19, and those in the Internal Affairs
Policies & Procedures which are secured by *N.J.S.A.* 40A:14-181.

348.    Any reasonable official would understand that the actions taken by Defendants would
violate Plaintiff's rights.

349.   As a direct and proximate result of Defendants' violation of Plaintiff's rights, Plaintiff has been caused to suffer damages.

350.   The retaliatory conduct by Defendants caused Plaintiff to suffer serious and grave economic consequences such as loss of financial income, back pay, front pay, etc.  The adverse employment actions by Defendants also caused Plaintiff to suffer stress, unnecessarily so, which in turn caused, and continues to cause anxiety, sleeplessness, worry, high blood pressure, loss of every day enjoyment in life due to interference from the worry and anxiety about the bad acts of Defendants as well as the stress and worry about her respective future.

## PRAYER FOR RELIEF

**WHEREFORE**, these premises considered, Plaintiff requests this court enter judgment in her favor on all counts and specifically:

1. Award Plaintiff compensatory damages for all monetary and financial losses, including (but not limited to): past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and other past and future pecuniary losses in an amount to be determined by an enlightened jury;

2. Award Plaintiff compensatory damages for non-pecuniary injuries including (but not limited to): emotional stress, anxiety, shame, embarrassment, humiliation, powerlessness, and indignity, in an amount to be determined by an enlightened jury;

3. Award Plaintiff exemplary and punitive damages in an amount to be determined by an enlightened jury;

4. Award Plaintiff reasonable attorneys' fees and costs of this action, including expert fees, and other fees and costs permitted by law;

5. Award Plaintiff other monetary damages to which she may be entitled to under law;

6. Award Plaintiff appropriate pre-judgment and post-judgment interest; and

7. Award Plaintiff such other relief, including equitable relief and costs, as may be appropriate, fair, and just.

## DESIGNATION OF TRIAL COUNSEL

Michelle J. Douglass, Esq., and Philip S. Burnham, II, Esq. are hereby designated as trial counsel in the above-captioned matter.

## CERTIFICATION OF NO OTHER ACTIONS PURSUANT TO RULE 4:5-2

I certify that the dispute about which I am suing is not the subject of any other action pending in any other court or a pending arbitration proceeding to the best of my knowledge and belief. Also, to the best of my knowledge and belief no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this complaint, I know of no other parties that should be made a part of this lawsuit. In addition, I recognize my continuing obligation to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

## CERTIFICATION OF COMPLIANCE WITH R. 1:38-7(c)

I certify the Confidential Personal Identifiers have been redacted from documents now submitted to the Court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

## NOTICE OF LITIGATION HOLD

The parties are hereby required to preserve all physical and electronic information that may be relevant to the issues to be raised, including but not limited to, Plaintiff's employment, to Plaintiff's cause of action, and/or prayers for relief, to any defenses to same, and pertaining to any party, including but not limited to, electronic data storage, close circuit TV footages, digital images, computer images, cache memory, searchable data, emails, spreadsheets, employment files, memos, text messages and any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook, Twitter, LinkedIn, etc.,) and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.

Failure to do so may result in separate claims for spoliation of evidence and/or for appropriate adverse inferences.

The obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation. You are on notice of litigation and therefore have an obligation to suspend your routine document retention/destruction policy and put in place a 'litigation hold' to ensure preservation of relevant documents." Failure to do so has been found to be 'grossly negligent' and may subject you to punishment.

## JURY DEMAND

The plaintiff hereby demands a trial by jury on all of the triable issues of this complaint, pursuant to New Jersey Court *Rules* 1:8-2(b) and 4:35-1(a).

Respectfully submitted,


**BURNHAM DOUGLASS**
Attorneys for Plaintiff, Stacie Lick


 /s/ *Michelle J. Douglass*
Michelle J. Douglass, Esq.

 /s/ *Philip S. Burham, II*
Philip S. Burnham, II, Esq.


Date: April 21, 2020